**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **MARGARET SUE PLASTER,** ) | | |
|    Plaintiff, ) | | |
| ) | | |
| v. ) | Civil Action No. 2:09cv00002 | |
| ) | **REPORT AND** | |
| ) | **RECOMMENDATION** | |
| **MICHAEL J. ASTRUE,** ) | | |
|  **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT | |
|    Defendant. ) | UNITED STATES MAGISTRATE JUDGE | |

*I. Background and Standard of Review*

The plaintiff, Margaret Sue Plaster, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Plaster protectively filed her application for DIB on March 5, 2007, alleging disability as of January 6, 2003, based on rheumatoid arthritis, anxiety, depression, back pain, chronic pain and hypertension. (Record, ("R."), at 79-81, 94, 98.) The claim was denied initially and upon reconsideration. (R. at 45-47, 52, 53-55, 57-59.) Plaster then requested a hearing before an administrative law judge, ("ALJ"). (R. at 60-61.) The ALJ held a hearing on September 22, 2008, at which Plaster was represented by counsel. (R. at 15-42.)

By decision dated October 27, 2008, the ALJ denied Plaster's claim. (R. at 10-14.) The ALJ found that Plaster met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2005. (R. at 13.) The ALJ also found that Plaster had not engaged in substantial gainful activity since January 6, 2003.[1] (R. at 13.) The ALJ found that the medical evidence established that Plaster suffered from severe impairments, namely degenerative disc disease of the back and neck, hypertension, with noncompliance with treatment, and borderline intellectual functioning, but he found that Plaster did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart

---

[1]Plaster's alleged date of disability was January 6, 2003, and her date last insured was March 31, 2005. Therefore, the relevant time period is January 6, 2003, through March 31, 2005.

P, Appendix 1. (R. at 13.) The ALJ also found that, during the period from January 6, 2003, through March 31, 2005, Plaster had the residual functional capacity to perform unskilled, light work,[2] that did not involve exposure to hazards or moving machinery and no more than occasional stooping, crouching or reaching. (R. at 13-14.) Therefore, the ALJ found that Plaster was unable to perform any of her past relevant work. (R. at 14.) Based on Plaster's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed that Plaster could perform. (R. at 14.) Thus, the ALJ found that Plaster was not under a disability as defined under the Act during the period from January 6, 2003, through March 31, 2005, and was not eligible for benefits. (R. at 14.) *See* 20 C.F.R. § 404.1520(g) (2009).

After the ALJ issued his decision, Plaster pursued her administrative appeals, (R. at 5), but the Appeals Council denied her request for review. (R. at 1-3.) Plaster then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is before the court on Plaster's motion for summary judgment filed June 22, 2009, and on the Commissioner's motion for summary judgment filed July 10, 2009.

## II. Facts

Plaster was born in 1961, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 79.) Plaster obtained her general equivalency development, ("GED"), diploma, and she has vocational training in cosmetology. (R.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

at 103.) She has past relevant work experience as an assembly worker, a cashier and a sewing machine operator. (R. at 147.)

Bonnie S. Martindale, a vocational expert, was present and testified at Plaster's hearing. (R. at 34-41, 76.) Martindale classified Plaster's past work as a molding machine operator as light and semi-skilled. (R. at 35.) She classified Plaster's past work as a sewing machine operator and as a cashier as light and unskilled. (R. at 35.) Martindale was asked to consider an individual of Plaster's age, education and past work experience who had the residual functional capacity to perform light work that did not involve more than occasional stooping, crouching and reaching and that did not require her to work around hazardous machines. (R. at 35-36.) Martindale stated that such an individual could not perform any of Plaster's past work. (R. at 37.) Martindale stated there would be jobs available that such an individual could perform, including jobs as an office worker, an interviewer, an information clerk and a router. (R. at 38-39.)

In rendering his decision, the ALJ reviewed medical records from Virginia Public Schools; Dr. Candace Bellamy, M.D.; Dr. Mark O'Brien, M.D.; Abingdon Primary Care; Dr. Todd Nairn, M.D.; Norton Community Hospital; Johnston Memorial Hospital; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Thomas Phillips, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Crystal Burke, L.C.S.W., a licensed clinical social worker; University of Virginia; and Melinda M. Wyatt, M.S., a licensed psychologist.

Plaster's school records from 1969 indicate that she had a total IQ score of 94. (R. at 149.)

On July 30, 2002, Dr. Mark O'Brien, M.D., of the William A. Davis Clinic, saw Plaster for complaints of anxiety and back pain. (R. at 158-59.) Dr. O'Brien reported that Plaster was alert and in no apparent distress. (R. at 158.) He diagnosed mild anxiety. (R. at 158.) Plaster failed to keep her August 2002 appointment. (R. at 157.)

On October 15, 2002, Plaster returned to William A. Davis Clinic and saw Dr. Candace Bellamy, M.D. (R. at 155-56.) Plaster complained of a lesion between her first and second toe, as well as a callus on the bottom of her left foot and left arm weakness. (R. at 155.) Upon examination, Plaster had normal muscle strength in her upper extremities. (R. at 155.) Dr. Bellamy diagnosed hypertension, left arm weakness, lesion of the left foot, callus on the bottom of left foot and anxiety. (R. at 155.) Dr. Bellamy reported that Plaster's weakness was subjective, as she had no weakness on examination. (R. at 155.)

The record shows that Plaster was seen at Abingdon Primary Care for complaints of hypertension, anxiety, bronchitis and back pain from January 2003 to June 2003. (R. at 162-66.) In May 2003, Plaster reported that she felt better since her blood pressure was under control. (R. at 164.)

On December 5, 2003, Dr. Todd Nairn, M.D., saw Plaster for complaints of cervical pain that radiated down into her right arm and lower back. (R. at 168-69.) Dr. Nairn reported that Plaster had no focal, motor or sensory deficits. (R. at 168.) She

had decreased range of motion secondary to pain and stiffness. (R. at 168.) Straight leg raising tests were negative. (R. at 168.) On March 5, 2004, Plaster complained of intermittent pain in her left heel and right hand. (R. at 192-93.) She reported that "my Lortab takes care of pain." (R. at 192.) Plaster also complained of low back pain that radiated into her legs bilaterally and increased arthritic pain of multiple joints. (R. at 192.) Dr. Nairn reported that Plaster had decreased range of motion in the thoracic and lumbar spine. (R. at 192.) Straight leg raising tests were negative. (R. at 192.) Dr. Nairn diagnosed degenerative disc disease, hypertension and anxiety. (R. at 192.) On June 8, 2004, Plaster continued to complain of low back pain. (R. at 194-95.) Plaster had decreased range of motion secondary to pain and stiffness in the lumbar and cervical spine. (R. at 194.) Dr. Nairn diagnosed degenerative disc disease, hypertension and anxiety. (R. at 194.) On February 3, 2005, Plaster reported that her blood pressure had been elevated. (R. at 200-01.) She reported noncompliance with medication secondary to financial concerns. (R. at 200.)

On March 4, 2005, Plaster reported that she was feeling better since taking medications. (R. at 202-03.) Her blood pressure was under good control with medication. (R. at 202.) On June 6, 2005, Plaster complained of neck and shoulder pain. (R. at 204-05.) She denied depressive symptoms. (R. at 204.) On September 8, 2005, Plaster complained of back pain and an increased level of stress. (R. at 206-07.) On December 8, 2005, Plaster's blood pressure was elevated. (R. at 208.) It was noted that Plaster was once again noncompliant with medication. (R. at 208.) On March 8, 2006, Dr. Nairn reported that Plaster's pain was stable. (R. at 209.) On May 16, 2006, Plaster complained of severe right wrist pain. (R. at 213-14.) Dr. Nairn diagnosed probable carpal tunnel syndrome. (R. at 213.) On August 16, 2006, Plaster complained

of neck and back pain. (R. at 215-16.) Dr. Nairn reported Plaster had decreased range of motion secondary to pain and stiffness in several joints. (R. at 215.) Testing revealed that Plaster suffered from rheumatoid arthritis. (R. at 218.) On April 18, 2007, Plaster reported that she was noncompliant with her blood pressure medication. (R. at 223, 226.) X-rays performed that day of Plaster's cervical spine were normal. (R. at 222, 228.) On July 7, 2008, Plaster reported increased pain in her back, neck, knees, hands and elbows. (R. at 299-300.) Plaster also reported that she was slightly depressed. (R. at 299.) Plaster's lumbosacral spine exhibited tenderness and muscle spasms. (R. at 300.) A straight leg raising test was negative. (R. at 300.) On April 3, 2008, Plaster denied any new depressive symptoms. (R. at 301.) On September 4, 2008, Dr. Nairn reported that Plaster could not perform full-time employment. (R. at 312.) On October 1, 2008, Dr. Nairn again reported that Plaster was disabled. (R. at 313.)

On December 28, 2004, Plaster was seen at the emergency room at Norton Community Hospital for complaints of back, neck and left finger pain after being assaulted the previous day. (R. at 172-81.) She was diagnosed with a back strain and hypertension. (R. at 174.) On May 14, 2006, Plaster was seen at the emergency room for complaints of pain with knots to her right wrist. (R. at 182-90.) X-rays of Plaster's right wrist and hand were normal. (R. at 189-90.)

On May 15, 2007, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Plaster had no medically determinable impairment. (R. at 229-41.)

On May 15, 2007, Dr. Thomas Phillips, M.D., a state agency physician, indicated that Plaster had the residual functional capacity to perform light work. (R. at 242-48.) He indicated that Plaster could frequently climb, balance, kneel and crawl and occasionally stoop and crouch. (R. at 244.) Dr. Phillips indicated that Plaster's ability to reach in all directions was limited. (R. at 244.) No visual or communicative limitations were noted. (R. at 244-45.) Dr. Phillips indicated that Plaster should avoid all exposure to hazards, such as machinery and heights. (R. at 245.)

On June 4, 2007, Crystal Burke, L.C.S.W., a licensed clinical social worker, saw Plaster for her complaints of depression and anxiety. (R. at 275.) On July 9, 2007, Burke reported that Plaster exhibited some depression, as well as chronic pain. (R. at 273.) Plaster reported various family stressors. (R. at 273.) On August 27, 2007, Plaster again reported family stressors, as well as pain. (R. at 270.) Burke reported that Plaster continued to exhibit some anxiety and depression. (R. at 270.) On October 8, 2007, Burke reported that Plaster had multiple somatic complaints and a flat affect. (R. at 286.) Burke encouraged Plaster to take her medications as prescribed. (R. at 286.) Plaster complained of pain and anxiety. (R. at 286.) Burke reported that Plaster was oriented and alert, and that her memory was intact. (R. at 286.) On December 17, 2007, Plaster reported family stressors, as well as pain. (R. at 284.) Burke reported that Plaster appeared depressed and that her affect was flat. (R. at 284.)

On January 21, 2008, Plaster reported multiple situational stressors. (R. at 311.) Burke reported that Plaster had symptoms of depression. (R. at 311.) On February 25, 2008, Plaster reported feelings of depression and anxiety. (R. at 310.) Burke reported that Plaster's mood was depressed with a flattened affect. (R. at 310.) Plaster reported

that she continued to take Xanax for panic attacks, which she reported as being helpful. (R. at 310.) On April 28, 2008, Plaster continued to exhibit some depression and anxiety. (R. at 308.) Burke reported that Plaster had poor coping strategies. (R. at 308.) Plaster reported multiple health problems that she was not receiving any treatment for due to lack of insurance and income. (R. at 308.) On July 14, 2008, Plaster reported "feeling very down" as a result of trying to deal with daily pain. (R. at 306.) Plaster's mood was depressed and she appeared anxious. (R. at 306.)

On August 16, 2007, Dr. Robert McGuffin, M.D., a state agency physician, indicated that Plaster had the residual functional capacity to perform light work. (R. at 249-55.) He indicated that Plaster could frequently balance, kneel and crawl and occasionally climb, stoop and crouch. (R. at 251.) Dr. McGuffin indicated that Plaster's ability to reach in all directions was limited. (R. at 251.) No visual or communicative limitations were noted. (R. at 251-52.) Dr. McGuffin indicated that Plaster should avoid moderate exposure to hazards, such as machinery and heights. (R. at 252.)

On August 16, 2007, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed at PRTF indicating that Plaster suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 256-68.) Milan indicated that there was insufficient evidence in the record to determine if Plaster's activities of daily living were restricted. (R. at 266.) He indicated that Plaster had no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 266.) He also found that Plaster had not experienced any episodes of decompensation. (R. at 266.)

On October 12, 2007, Plaster underwent an MRI of the cervical spine at the University of Virginia, which showed mid and lower cervical dextroscoliosis with straightening of the cervical spine and multi-level degenerative changes involving the C3-C4, C4-C5, C5-C6 and C6-C7 disc levels with small disc osteophyte complexes without central canal or neural foraminal narrowing. (R. at 276-77, 297-98.) On April 12, 2008, an MRI of Plaster's lumbar spine showed bilateral facet joint degenerative changes from the L3-L4 through L5-S1 levels and mild degenerative disc disease at the L5-S1 level. (R. at 294-96.) No significant central canal stenosis was noted. (R. at 296.) On April 24, 2008, Dr. John A. Jane, Sr., M.D., reported that Plaster had suffered from rheumatoid arthritis and severe neck pain since 2003. (R. at 292.) Dr. Jane reported that Plaster's examination was negative except for early, but fairly widespread, rheumatory arthritis. (R. at 292.) He reported that Plaster's neck showed scoliosis and degenerative disc disease of a "pretty advance nature considering her age." (R. at 292.)

On March 20, 2008, Melinda M. Wyatt, M.S., a licensed psychologist; evaluated Plaster at the request of Plaster's attorney. (R. at 287-91.) Plaster reported initial concerns with depressed mood approximately a year and a half prior. (R. at 288.) Wyatt reported that Plaster's mood was depressed and her affect restricted. (R. at 289.) No evidence of a thought content impairment was noted. (R. at 289.) Plaster's insight appeared limited. (R. at 289.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Plaster obtained a verbal IQ score of 66, a performance IQ score of 72 and a full-scale IQ score of 65. (R. at 289-90.) The Wide Range Achievement Test-Revision Three, ("WRAT-III"), was administered, indicating that Plaster functioned at the fifth-grade level in reading and

spelling and at the sixth-grade level in arithmetic. (R. at 290.) The Personality Assessment Inventory, ("PAI"), indicated that Plaster experienced tension and anxiety. (R. at 290.) Wyatt diagnosed major depressive disorder, generalized anxiety disorder and mild mental retardation. (R. at 291.) Wyatt reported that Plaster's prognosis was considered guarded. (R. at 291.) Based on Plaster's level of cognitive functioning, she was not considered capable of managing an allowance without assistance if awarded benefits. (R. at 291.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 27, 2008, the ALJ denied Plaster's claim. (R. at 10-14.) The ALJ found that the medical evidence established that Plaster suffered from severe impairments, namely degenerative disc disease of the back and neck, hypertension, with noncompliance with treatment, and borderline intellectual functioning, but he found that Plaster did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.) The ALJ also found that, during the period from January 6, 2003, through March 31, 2005, Plaster had the residual functional capacity to perform unskilled, light work, that did not involve exposure to hazards or moving machinery and no more than occasional stooping, crouching or reaching. (R. at 13-14.) Therefore, the ALJ found that Plaster was unable to perform any of her past relevant work. (R. at 14.) Based on Plaster's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed that Plaster could perform. (R. at 14.) Thus, the ALJ found that Plaster was not under a disability as defined under the Act during the period from January 6, 2003, through March 31, 2005, and was not eligible for benefits. (R. at 14.) *See* 20 C.F.R. § 404.1520(g).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Plaster argues that the ALJ failed to discuss the medical evidence of record subsequent to March 2005. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-4.) In this case, Plaster alleges that she became disabled on January 6, 2003. (R. at 79.) Her insured status expired on March 31, 2005. (R. at 84, 94.) Thus, Plaster's burden, for purposes of DIB, was to establish that she was under a disability during the period between January 6, 2003, and March 31, 2005.

Plaster's earnings records indicate that she had no income after 2001. (R. at

87.) She indicated on her Disability Report that she stopped working in June 2001 as a result of her medical condition. (R. at 98.) However, there is no record of any medical treatment prior to January 2002. (R. at 160.) Plaster testified that she was unable to work due to swelling in her hands and feet, along with neck pain and an inability to walk much. (R. at 20.)

In July 2002, Plaster complained of back pain and anxiety and denied other pains. (R. at 158.) She was in no apparent distress and was diagnosed with mild anxiety, which she reported experiencing since her teenage years. (R. at 158, 275.) In October 2002, Plaster denied numbness and despite her subjective complaints of left arm weakness, there was no evidence of a strength deficit on examination. (R. at 155.) In May 2003, March 2004 and March 2005, Plaster's intermittent pain and hypertension were controlled with medications. (R. at 164, 192, 202.) Plaster had no edema in her extremities, and no focal, motor or sensory deficits. (R. at 168, 192-98.) In June 2005, Plaster denied depressive symptoms. (R. at 204.) In May 2006, an emergency room report indicated that Plaster's examination was unremarkable, she had full range of motion and her x-rays revealed no abnormality. (R. at 182, 189-90.) Her rheumatoid factor was found to be high, but an x-ray of her cervical spine showed no degenerative changes. (R. at 218, 222, 228.) In February 2008, Plaster reported that her medication helped control her panic attacks, and in April 2008, she denied symptoms of depression. (R. at 301, 310.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Furthermore, the state agency physicians indicated that Plaster had the residual functional capacity to perform a limited range of light work. (R. at 242-48, 249-55.)

The state agency psychologists found that Plaster suffered from a nonsevere affective disorder and an anxiety-related disorder, and that she had no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 256-68.)

While Plaster does not contend that her mental impairment meets or equals the criteria for § 12.05(c), the listing for mental retardation, I do note that in March 2008, she obtained a verbal IQ score of 66, a performance IQ score of 72, and a full-scale IQ score of 65. (R. at 289-90.) To meet the impairment requirements of § 12.05(C), a claimant's mental functioning must be limited to the extent that she scores between 60 and 70 on a valid IQ test, and she must suffer from another impairment that imposes a significant work-related limitation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (2009). Additionally, the mental deficits must have manifested during the claimant's developmental stage, i.e., prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. While these scores place Plaster within the range required by § 12.05(C), there is no indication establishing mental retardation before age 22. School records indicate that Plaster had a total IQ score of 94, and Wyatt diagnosed only mild mental retardation. (R. at 149, 291.) The record also demonstrates that Plaster's intellectual capacity did not render her unemployable. (R. at 147.) In fact, the vocational expert classified one of Plaster's past relevant jobs as semi-skilled work. (R. at 35.) Based on the above, I find that Plaster did not meet or equal § 12.05(C).

**PROPOSED FINDINGS OF FACT**

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Plaster's residual functional capacity; and

3. Substantial evidence exists to support the ALJ's finding that Plaster was not disabled under the Act during the period between January 6, 2003, and March 31, 2005.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Plaster's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 22nd day of January 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE